## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DITECH FINANCIAL LLC,

       Plaintiff,

v.                               Case No: 8:20-cv-409-WFJ-AEP

AIG SPECIALTY INSURANCE
COMPANY; STARR INDEMNITY
& LIABILITY COMPANY,

       Defendants.

_____/

## ORDER

Plaintiff Ditech Financial LLC seeks insurance coverage for a $23.9 million settlement that rectified alleged deficiencies in its mortgage servicing practices. Before the Court today are two motions for summary judgment: (1) Plaintiff Ditech's Motion for Summary Judgment, Dkt. 63; and (2) the Joint Motion for Summary Judgment filed by Defendants AIG Specialty Insurance Company and Starr Indemnity & Liability Company, Dkt. 72. The parties filed several responses and replies, *see* Dkts. 78, 79, 80, 81, 86, 87, 91, 92, and the Court held a hearing on the matter on July 27, 2021. With the benefit of full briefing and oral argument, the Court grants the Defendants' motion and denies the Plaintiff's motion.

## BACKGROUND

### I.     The Insurance Policies

Plaintiff Ditech is seeking coverage under two insurance policies (the "Policies"). The first policy was issued by AIG Specialty Insurance Company ("ASIC") to Walter Investment Management Corp.[1] Dkt. 53-2 at 1. The Court will refer to this as the "ASIC Policy." This policy's Limit of Liability is $5,000,000 with a $500,000 deductible on claims other than class actions. *Id.* at 2. The policy period runs from September 1, 2016, to September 1, 2017. *Id.*

The Insuring Clause of the ASIC Policy states:

> In consideration of payment of the premium and subject to the Declarations, limitations, conditions, provisions and other terms of this Policy, the Insurer agrees . . . [t]o pay on behalf of the Insureds [sic] Loss which the Insureds shall become legally obligated to pay as a result of any Claim first made against the Insureds during the Policy Period for any Wrongful Act committed by the Insureds during or prior to the Policy Period while performing Professional Services including failure to perform Professional Services.

Dkt. 1-1 at 5. The ASIC Policy defined "Claim" as:

> 1) any written notice received by an Insured that any person or entity intends to hold any Insured responsible for a Wrongful Act,
>
> 2) a civil proceeding commenced by the service of a complaint or similar pleading,

---

[1] Walter Investment Management Corp. changed its name to Ditech Holding Corp. during a bankruptcy proceeding between November 2017 and February 2018. Dkt. 72 at 3 n.1. Plaintiff Ditech Financial LLC is a subsidiary of Ditech Holding Corp. and therefore claims it is an insured under the Policy. Dkt. 64 at 1.

> 3) a criminal proceeding commenced by a return of an indictment,
>
> 4) a formal civil, criminal, administrative, regulatory or arbitration proceeding commenced by the filing of a notice of charges, formal investigative order, demand for arbitration or similar document, or
>
> 5) any arbitration or other alternative dispute resolution proceeding commenced by the receipt of a demand for arbitration or similar document, or the foreign equivalent thereof,
>
> against any Insured for a Wrongful Act, including any appeal therefrom.

Dkt. 1-1 at 10. "Wrongful Act" is defined as:

> any error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted by the Insureds, or any person for whose actions the Insureds are legally responsible, which arises solely from the Insureds performing Professional Services, including failure to perform Professional Services.

Dkt. 1-1 at 13. Under the ASIC Policy, Professional Services includes the "servicing of any loan." Dkt. 64 at 2 ¶ 8; Dkt. 66-1 at 1322.

Starr Indemnity & Liability Company ("Starr") issued the second policy, which will be referred to as the "Starr Policy." It is an excess liability policy that follows form to the ASIC Policy. Dkt. 53-1 at 2. Its Limit of Liability is $5,000,000 over the $5,000,000 in primary coverage under the ASIC Policy. *Id.* It provides coverage only to "those claims that are first made against the insureds during the policy period and reported in writing to the insurer pursuant to the terms

herein." *Id.* at 2 (emphasis deleted). It has the same policy period as the ASIC Policy: September 1, 2016, to September 1, 2017. *Id.*

## II.     The Underlying Conduct: Ditech's $23.9 Million Settlement

Plaintiff Ditech was a mortgage loan servicing company.[2] Dkt. 63 at 2. It began attracting regulatory scrutiny in 2014 for several deficiencies in its mortgage servicing practices.[3] Dkt. 64 at 4, 7. At issue here is only one such deficiency: Ditech's failure to run annual escrow analyses for borrowers who were in Chapter 13 bankruptcy proceedings. *Id.* (stating that Ditech is not making a claim against Defendants with respect to the other deficiencies). This is the purported Wrongful Act at the center of this case. Dkt. 73 at 7 ¶ 33; Dkt. 64 at 6.

In a nutshell, Ditech failed to analyze changes in borrowers' property tax and insurance payments when those borrowers were in bankruptcy. It was Ditech's practice to suspend all annual escrow analyses on a borrower's account when that borrower had a pending bankruptcy proceeding. Dkt. 73-6 at 1. But the borrower's tax and insurance requirements still changed yearly, requiring additional funds for escrow outlays. *Id.* This resulted in negative variances, or "escrow shortages," in the borrowers' individual escrow accounts, for which the borrowers remained

---

[2] Ditech is no longer operating; it is in the process of being liquidated in a bankruptcy proceeding. Dkt. 63 at 2 n.1.
[3] The regulatory scrutiny initially focused on Green Tree Credit Solutions LLC and Ditech's predecessor, Walter Investment Management Corp. However—in August 2015—Green Tree, Ditech Mortgage Corporation, and DT Holdings LLC merged to become Plaintiff Ditech Financial. Dkt. 73-34. The Court will therefore collectively refer to the entities as "Ditech."

liable under the terms of their respective mortgages. Dkt. 64 at 4 ¶ 20. Ditech paid the increased amounts and later sought to collect these amounts from the borrowers after their bankruptcy proceedings had ended. Dkt. 73-6 at 2. Ditech did not notify the borrowers, trustees, or bankruptcy courts about these changes to the expected escrow outlays or the resulting changes to the borrowers' required monthly escrow payments. *Id.* at 1.

The Executive Office of the United States Trustee ("EOUST") raised this escrow analysis issue to Ditech sometime in 2014 or 2015. *See* Dkt. 64 at 4 ¶ 22 (conceding that in 2014 and 2015 the EOUST's discussions with Ditech included "limited discussions about the fact that Ditech was not conducting annual escrow analyses for borrowers who were in Chapter 13 bankruptcy"). By mid-2015, the EOUST alleged that Ditech's failure to run annual escrow analyses was wrongful. Dkt. 73-8—depo. at 23–25. Ditech argued it was not legally required to run annual escrow analyses under the Real Estate Settlement Procedures Act of 1974 and 12 CFR 1024.1, Regulation X, ("RESPA"). *Id.*—depo. at 70. The EOUST did not accept this argument. *Id.*—depo. at 71.

In July 2015, Walter Investment Management Corp. sent two notices to its primary D&O liability carrier, XL Specialty Insurance Company. Dkt. 73-3; Dkt. 73-11. The first notice stated in relevant part:

> The circumstances prompting this notice arise out of the fact that Green Tree Services initially met with a U.S. Trustee representative in June

> 2014 and discussed Green Tree Services practices when servicing loans of customers who have sought relief under the U.S. Bankruptcy Code. Green Tree Services evaluated and adjusted, when appropriate, its bankruptcy practices and staffing, with the results discussed in multiple conference calls with the U.S. Trustee representatives in 3Q and 4Q 2014.

Dkt. 73-3 at 1. The second notice—sent one day later—stated in relevant part:

> Supplementing Our Notice of Circumstances dated July 30, 2015 regarding the U.S. Bankruptcy Trustee, the U.S. Trustee's office has raised a number of issues regarding the treatment of accounts in bankruptcy. Subsequent to the initial contact, Green Tree has received a number of additional inquiries and requests for discovery from U.S. Trustee offices across the country. The inquiries and requests for discovery are brought in individual bankruptcy cases but seek a broad range of information regarding Green Tree's general policies and practices with respect to bankruptcy. Green Tree has engaged in discussions with representatives from the Executive Office in Washington D.C. to address their issues. More recently, GTS has engaged in discussions with US Trustee representatives regarding loan modifications and escrow analysis issues. GTS has agreed to continued discussions on these and other concerns in the near future.

Dkt. 73-11 at 1.

Conversations between Ditech and the EOUST continued. On October 8, 2015, an attorney for the U.S. Trustee Program ("USTP") sent an email to Ditech's counsel, stating in part:

> Ditech continues to have serious deficiencies in its mortgage servicing practices for borrowers in bankruptcy and these deficiencies are broader than the loan modification issues that we have been discussing. In addition, it appears that the deficiencies with the loan modification process exist in a larger number of cases than we initially understood. Accordingly, the United States Trustee Program intends to move forward with discussions concerning a national settlement with Ditech that addresses all of the mortgage servicing deficiencies for borrowers

6

in bankruptcy, rather than trying to carve out the loan modification issues and address those in a separate national settlement.

Dkt. 73-19 at 1–2. After receipt of this email, Ditech's General Counsel agreed to schedule a face-to-face meeting with the EOUST in Washington, D.C. Dkt. 73-17 at 51–52.

Toward the end of 2015, Ditech began estimating write-off calculations to remediate the escrow analysis issue. Dkt. 73-42; Dkt. 73-36. Ditech based its calculations in part on the "Chase Method." Dkt. 73-13 at 47–48; Dkt. 73-36; Dkt. 73-42; Dkt. 73-38 at 18. In March 2015, JP Morgan Chase ("Chase") entered a national settlement with the USTP regarding deficiencies in its own mortgage servicing processes. *Id.* This settlement included monetary consumer remediation. Dkt. 73-13 at 48. Ditech used the same calculus that Chase previously used to estimate its own remediation numbers. Dkt. 73-13 at 47–48; Dkt. 73-38 at 18. On December 7, 2015, using the Chase Method, Ditech estimated that roughly 6,128 mortgage servicing accounts were in the escrow remediation population and that the projected write-off would total $8.6 million. Dkt. 73-42. Ten days later, Ditech increased the write-off remediation estimate to $15,102,171. Dkt. 73-36 at 1.

On March 30, 2016, a USTP attorney emailed Ditech, asking in part: "How does Ditech plan to deal with the escrow surplus or shortage caused by its failure to run escrow analyses?" Dkt. 73-15. The parties agreed to meet on April 6, 2016, to

discuss Ditech's mortgage servicing deficiencies. *Id.* One agreed-upon topic of conversation was Ditech's failure to run escrow analyses. *Id.*

During this meeting, the Director of the USTP announced that any settlement between the USTP and Ditech needed to include four essential components: (1) a robust statement of facts, (2) consumer remediation, (3) injunctive relief which generally includes operational enhancements to address deficiencies, and (4) an independent monitor. Dkt. 73-21; Dkt. 73-13 at 28–29. On April 11, 2016, a USTP attorney emailed Ditech requesting a response to these four proposed components. Dkt. 73-21.

On April 22, 2016, Ditech's counsel sent a letter to the USTP, stating in part: "Ditech agrees in principal [sic] to the four components of a potential settlement and we have begun working on a draft document to exchange with you." Dkt. 73-22 at 2. Ditech's counsel then sent EOUST attorneys an "initial draft of a proposed consent order to address the company's bankruptcy practices." Dkt. 73-23. This draft settlement consent order—sent on June 10, 2016—was intended to resolve all of Ditech's mortgage servicing deficiencies, including its failure to run annual escrow analyses. *Id.* at 10–11. The proposal provided borrowers up to sixty days to pay their respective escrow shortages. Dkt. 64 at 5. This would have resulted in no financial loss to Ditech for the escrow analysis issues. Dkt. 65-1, Ex. B at 3.

Walter Investment Management Corporation/Ditech began meeting with insurance underwriters in June 2016 to procure insurance policies for the 2016-2017 policy year. Dkt. 73-4; Dkt. 73-53. Underwriters for ASIC and Starr attended one such meeting. Dkt. 73-4 at 2. Ditech presented a PowerPoint there that included the following slide:

## REGULATORY and LITIGATION UPDATE

**Bankruptcy/US Trustee Matters:**

- US Trustee offices around the country have issued varying informal requests, motions, objections, and subpoenas seeking production of documents and Rule 2004 examinations in individual Ch. 13 BK cases. Information requests are broad-based, seeking information about general practices and policies that often exceed the circumstances in the individual cases.

- Primary issues:
  - Failure to timely file Notices of Payment Changes or Motions for Approval of Loan Modifications
  - Failure to conduct annual escrow analyses
  - Filing of Proofs of Claim seeking to collect insurance and/or tax advances incurred during pendency of a prior, discharged chapter 13 BK
  - Post-BK discharge collection of debts in violation of confirmation/discharge order

**Bankruptcy/US Trustee Matters:**
- Since January 2016, Ditech has been named as a defendant in 20 defensive litigation matters in 14 bankruptcy courts where it is alleged that Ditech attempted to collect on discharged debts and violated automatic stays, amongst other claims. Ditech has improved the management of defensive litigation matters in bankruptcy proceedings:

  - All defensive matters in bankruptcy courts are managed by one senior counsel
  - The team handling U.S. Trustee matters is notified of every new defensive matter in a bankruptcy court or related bankruptcy proceedings or orders
  - Defensive matters filed by debtors or bankruptcy trustees that touch on issues raised by the U.S. Trustees are referred to designated counsel to ensure Ditech's defense strategy is consistent in its dealings with trustees.



Confidential                                                                                        42

AIG-ID-0001383

Dkt. 73-54 at 42. Ditech did not disclose that it had reached an agreement in principle with the EOUST for a national settlement.

On August 5, 2016, Ditech's counsel exchanged emails with a USTP attorney regarding the USTP's prior direction that Ditech "re-review" the Chase settlement. Dkt. 73-24.

Ditech held a conference call with representatives from Bank of America on August 10, 2016. Dkt. 73-5. In the email invitation to the call, Ditech stated:

> [I]n December 2015 [Ditech] changed its business practices to ensure loans in bankruptcy receive an escrow analysis at least one time every 12 months. As we shared with you, Ditech has identified a population of BANA loans where an escrow analysis was not performed at least one time every 12 months during the bankruptcy. *** We [Ditech] are in active discussions with the United States Trustee Program regarding the proper handling of remediation of these loans in active and discharged Ch. 13 cases and note that all costs associated with the remediation will be borne by Ditech. As of June 2016, we have identified 1,769 BANA loans in this population.

*Id.*

Meanwhile, Ditech continued the process of brokering insurance policies for the 2016-2017 policy year. On August 31, 2016, Ditech's insurance broker submitted Ditech's signed application for the Policies with ASIC and Starr. Dkt. 73-48. On August 31, 2016, ASIC provided a Temporary and Conditional Cover Note as a placement confirmation for the manuscripted E&O policy, stating: "A condition precedent to coverage afforded by this Conditional Cover Note is that no material change in the risk occurs and no submission is made to the Insurer of a claim or circumstance that might give rise to a claim between the date of this

10

conditional Cover Note and the Effective date." Dkt. 73-56. The ASIC and Starr

Policies then became effective on September 1, 2016.

Ditech sent the USTP a presentation entitled "Escrow Remediation Update"

on or about September 14, 2016. Dkt. 73-25. Included in this presentation was a

"Chase Net Shortage Calculation" totaling $16,881,676.69 in remediation. *Id.* at 4.

The presentation also compared Ditech's settlement calculations to earlier

settlements entered into by Chase and Wells Fargo. *Id.* at 11.

On October 7, 2016, Ditech sent the EOUST a redlined version of the

proposed consent order it previously sent on June 10, 2016. Dkt. 73-14. This

proposal again explicitly dealt with Ditech's failure to run annual escrow analyses.

*Id.* at 12–14. Ditech again proposed providing borrowers up to sixty days to pay

their respective escrow shortages, which would result in no financial loss to

Ditech. *Id.*

On December 6, 2016, Ditech again sent the USTP a proposal for escrow

remediation. Dkt. 73-26. The proposal stated: "Ditech recognizes the UST's

position and is offering to provide significant waivers of tax and insurance

increases advanced to borrowers while in bankruptcy using the 'Chase Method.'"

*Id.* at 2. The proposal included escrow adjustments (i.e., funding borrowers'

escrow accounts) of approximately $7.3 million. *Id.* In February 2017, Ditech

increased its escrow remediation settlement offer to "$16M for 11,286 accounts."

Dkt. 73-29 at 3.

Ditech provided notice of the EOUST's claim to ASIC (with copy to Starr)

on April 17, 2017. Dkt. 73-30. This was the first official Notice of Claim sent to

the Defendants regarding the "US Trustee Dispute." *Id.* at 2. The Notice stated:

> A description of Claim, the nature of the alleged Wrongful Act, the
> nature of the alleged or potential damages, and the names of actual or
> potential claimants are set forth in the foregoing filings and e-mail.
> Walter Investment Management first became aware of the Claim at or
> about the time it received copies of the forgoing filings and e-mail.

*Id*. Attached to the Notice were motions, filings, and objections from thirteen

pending bankruptcy proceedings. *Id.* at 2–3. Ditech claims these bankruptcy

papers, which are referred to as the "Loan Relief Motions," constitute the

EOUST's first Claim, as defined by the Policies. Dkt. 63 at 9. The Notice did not

disclose the ongoing settlement negotiations with the EOUST nor Ditech's recent

escrow remediation settlement offer of $16 million.

On May 16, 2017, an ASIC representative wrote a letter stating that ASIC:

> reserves all rights as to whether the Loan Relief Motions would
> constitute a Claim first made during the Policy Period of the Policy in
> the event that Ditech had been the subject of a similar motion filed prior
> to the commencement of the Policy Period.

Dkt. 73-60 at 5 n.15. The letter further stated:

> AIG Specialty shall not be liable for any settlement, Defense Costs,
> assumed obligation or admission to which it has not consented . . . AIG
> Specialty shall have the right and shall be given the opportunity to

effectively associate with the Insureds in the investigation, defense and settlement, including but not limited to the negotiation of a settlement, of any Claim that appears reasonably likely to be covered in whole or in part by the Policy.

*Id.* at 9.

In late June, Ditech proposed to USTP that "Loans in the Escrow Remediation Population will be remediated under the Escrow Proposal for any failure to run annual EAs during bankruptcy." Dkt. 73-31 at 4. Ditech represented that the total "Shortage" was $5,287,013.74 and Ditech's Negative Variance was $3,211,886.12. *Id.* at 5. On July 19, 2017, Ditech updated the escrow remediation offer to $12,729,749. Dkt. 73-32 at 4.

On the same day, Ditech sent ASIC a Supplemental Notice of Claim that listed seventeen additional Loan Relief Motions filed in various bankruptcy proceedings across the country. Dkt. 73-18. Ditech wrote that it "welcome[d] AIG's participation and assistance in investigating, defending, and (potentially) settling the Claim." *Id.* at 5–6. The Supplemental Notice of Claim did not disclose Ditech's escrow remediation settlement offers.

On November 1, 2017, Ditech's counsel sent ASIC a letter providing additional information regarding "the potential settlement of allegations raised by the [EOUST] relating to Ditech's practices of calculating escrow amounts for its borrowers who are in bankruptcy proceedings." Dkt. 73-6 at 1. Ditech explained that the EOUST demanded Ditech waive its ability to recover deficiencies and

shortages caused by its failure to run annual escrow analyses. *Id.* at 2. Ditech stated: "In the context of any settlement with the [EOUST], Ditech will be out-of-pocket for the amounts it paid to third-parties during borrowers' bankruptcy proceedings that exceeded the amounts billed to the borrower according to the initial escrow analyses." *Id.*

On November 3, 2017, Ditech requested written consent from ASIC and Starr for Ditech to make a proposed settlement offer to the EOUST. Dkt. 73-63 at 1. Attached to the email were documents entitled "Ditech UST Settlement: Term Sheet" and "Ditech Remediation Chart." These documents reflected an "Aggregate Credit, Waiver, Refund or Release of Surplus Approx" of "$33.44M," of which the "Escrow Neg. Variance Subtotal" was "$15.61M." *Id.* at 10.

Ditech reached a final settlement with the EOUST in September 2019. Dkt. 73-16. In this agreement, Ditech admitted the escrow analysis issue affected 13,774 mortgage loans. *Id.* at 7. The final escrow remediation totaled $23.98 million. *Id.* Ditech paid this by crediting borrowers' escrow accounts or by sending refunds to borrowers. Dkt. 64 at 7–8. This is the alleged "Loss" Ditech is seeking to recover under the Policies. *Id.* at 8. Both ASIC and Starr denied Ditech's claim for coverage on or about January 8, 2018. Dkt. 66-1, Ex. C ¶ 6.

Ditech filed this suit in February 2020 seeking insurance coverage for its losses and alleging the Defendants breached the Policies by refusing to provide any

coverage. Dkt. 1. Now before the Court are the parties' cross motions for summary judgment.

## LEGAL STANDARD

Summary judgment should be entered only if there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; it must be a *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* at 248.

If factual issues are present and they are material, the Court must deny the motion and proceed to trial. *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990).

## DISCUSSION

Although Defendants ASIC and Starr put forth several arguments why there is no coverage here, this case begins and ends with their first argument: the loss

falls outside of coverage because the EOUST made its first Claim against Ditech

before the inception of the Policies. As explained below, Plaintiff Ditech has failed

to satisfy its burden of establishing that coverage is appropriate because the

EOUST's Claim was made well before the policy period. *See LaFarge Corp. v.*

*Travelers Indem. Co*., 118 F. 3d 1511, 1516 (11th Cir. 1997) (stating that the

insured—not the insurer—bears the burden of proving that a claim is covered by

an insurance policy).

## I.     The EOUST Made Its First Claim Against Plaintiff Ditech In An Email Sent On October 8, 2015.

Both the ASIC Policy and the Starr Policy are "claims made" policies.[4] Dkt.

53-2 at 2; Dkt. 53-1 at 5. This means coverage is triggered only if a claim is first

made against the insured during the policy period. *See First Pros. Ins. Co. v.*

*McKinney*, 973 So. 2d 510, 514–15 (Fla. 1st DCA 2007) (describing a "claims

made" policy as providing coverage for claims "actually made during the policy

period"). If the first claim is made outside of the policy period, then there is no

coverage. Here, Plaintiff Ditech is entitled to coverage only if the EOUST made its

---

[4] *See* ASIC Policy, Dkt. 1-1 at 5 ("[T]he Insurer agrees . . . to pay on behalf of the Insureds [sic] Loss which the Insureds shall become legally obligated to pay **as a result of any Claim first made against the Insureds during the Policy Period** for any Wrongful Act committed by the Insureds during or prior to the Policy Period while performing Professional Services[.]") (emphasis added); *see also* Starr Policy, Dkt. 53-1 at 2 (providing coverage only for "**those claims that are first made against the insureds during the policy period** and reported to Starr pursuant to the terms herein") (emphasis added).

first claim between September 1, 2016, and September 1, 2017 (the "Policy Period").

Both sides agree the EOUST communicated with Ditech several times before the Policy Period. But they contest whether these communications constitute "Claims" under the Policies. Plaintiff Ditech argues that no pre-policy communications rise to the level of a Claim as defined by the Policies, thereby allowing coverage here. Dkt. 78 at 2. But Defendants ASIC and Starr disagree. They argue the EOUST emailed Ditech four pre-policy communications that independently and collectively satisfy the definition of a Claim: (1) an email sent on October 8, 2015; (2) an email sent on March 30, 2016; (3) an email sent on April 11, 2016; and (4) an email sent on August 5, 2016. Dkt. 91 at 1–2. The Court agrees that the October 8th email constitutes a Claim.

The ASIC Policy defines a Claim as:

1) any written notice received by an Insured that any person or entity intends to hold any Insured responsible for a Wrongful Act,

2) a civil proceeding commenced by the service of a complaint or similar pleading,

3) a criminal proceeding commenced by a return of an indictment,

4) a formal civil, criminal, administrative, regulatory or arbitration proceeding commenced by the filing of a notice of charges, formal investigative order, demand for arbitration or similar document, or

> 5) any arbitration or other alternative dispute resolution proceeding commenced by the receipt of a demand for arbitration or similar document, or the foreign equivalent thereof,

against any Insured for a Wrongful Act, including any appeal therefrom.

Dkt. 1-1 at 10.

At issue here is the first prong of the definition. The language of this prong is quite broad. It does not require that a Claim be as formal as civil or criminal proceedings, as evinced by the disjunctive inclusion of subsections (2) and (3). Nor does it require that the third party definitively prove the Wrongful Act referenced in the notice. All that is required is a written notice sent to Ditech that a third party intends to hold it responsible for a Wrongful Act.

On October 8, 2015—eleven months before the Policy Period—an attorney for the U.S. Trustee sent Ditech's counsel an email that stated in relevant part:

> [I]t appears that the deficiencies with the loan modification process exist in a larger number of cases than we initially understood. **Accordingly, the United States Trustee Program intends to move forward with discussions concerning a national settlement with Ditech that addresses all of the mortgage servicing deficiencies for borrowers in bankruptcy, rather than trying to carve out the loan modification issues and address those in a separate national settlement**.

Dkt. 73 at 9 (emphasis added).

This bolded language falls squarely within the definition of a Claim under the Policies. It is a written notice (i.e., an email) received by Ditech that the

EOUST intended to hold Ditech responsible (i.e., through a national settlement) for a Wrongful Act (i.e., all of Ditech's mortgage servicing deficiencies for borrowers in bankruptcy). This email is not a simple request for more information or a mere inquiry into some untoward event. *See Off. Depot, Inc. v. Nat'l Union Fire Ins. Co.*, 453 F. App'x 871, 876 (11th Cir. 2011) (stating that broad requests for information did not rise to the level of a Claim). The email contains a specific demand for Ditech to rectify the legally cognizable damage created by its escrow analysis deficiencies.

Plaintiff Ditech argues the October 8th email does not bar coverage because it does not cover the Wrongful Act at issue in this case—Ditech's failure to run annual escrow analyses. According to Ditech, this email focuses on the other deficiencies in its mortgage servicing practices, such as its issues with loan modifications, payment change notices, and proofs of claim. Dkt. 78 at 7.

The Court disagrees. The email says that the EOUST intended to hold Ditech responsible for *all* mortgage servicing deficiencies for borrowers in bankruptcy. At this point in the timeline, the EOUST had already raised concerns about the escrow analysis issue to Ditech. Ditech admitted as much in a letter to its D&O liability carrier on July 31, 2015. *See* Dkt. 73-11 (letter stating that Ditech "has engaged in discussions with US Trustee representatives regarding loan modifications and *escrow analysis issues*") (emphasis added). And Ditech's

counsel testified that the EOUST's discussions with Ditech included the escrow analysis issue as early as mid-2015. Dkt. 73-8 at 20–21.[5] The Court therefore finds that this email covers the Wrongful Act at issue in this case.

Plaintiff Ditech also argues that the Policies' definition of Claim should be interpreted as follows: "any written notice that a claimant intends to hold the Insured responsible *for some monetary loss* resulting from the Wrongful Act." Dkt. 92 at 1 (emphasis added). In essence, Plaintiff seeks to import a money damages requirement into the definition of Claim. Plaintiff argues this is appropriate because the ASIC Policy's Insuring Clause covers only a "Loss which the Insureds shall become legally obligated *to pay* as the result of any Claim[.]" Dkt. 78 at 8 n.1. And Loss is defined as "the total amount which any Insured becomes legally obligated *to pay* as the result of any Claim[.]" Dkt. 1-1 at 11. According to Ditech, these provisions and others tie the making of a Claim to a demand for payment of money. Dkt. 78 at 8 n.1. And without such a demand for payment of money, a written notice cannot constitute a Claim. *Id.*

Ditech's narrow reading of the term Claim as a "demand for money" is inconsistent with the Policy definitions agreed to by the parties. Nowhere in the

---

[5] "Q: When did these meetings begin to discuss the wrongful acts that are the subject of this coverage dispute? A: We started to discuss the escrow issues and the failure to run annual escrow analysis I believe in—I mean, it first came up in mid 2015 . . . Q: Is your testimony that the discussions with the US Trustees regarding the failure to run escrow analyses and the various escrow issues then began in mid 2015, is that an accurate characterization? A: Based on my recollection and review of the documents I think that's right."

definition of Claim does a requirement for monetary damages appear. Nor does the term "Loss." All that a Claim requires is a written notice that a third party intends to hold Ditech responsible for its Wrongful Acts. This leaves open the possibility that Ditech's responsibility could be borne out through the payment of monetary damages or some other form of specific relief. Under Ditech's proposed construction, there would be no coverage for litigation resulting in injunctive relief. If Ditech wished to narrow the definition of Claim in this way, it should have done so when bargaining with Defendants. The Court will not import a damages requirement in the face of clear and unequivocal language in the Policies.[6] *See Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1186 (11th Cir. 2002) (stating that the plain language of an insurance policy, as bargained for by the parties, should be given effect when such language is unambiguous).

In short, the October 8th email contains every element of a Claim as defined by the Policies. This email was sent well before the Policy Period—indeed, almost a year before. It therefore bars coverage under the claims made Policies, and summary judgment is granted in favor of the Defendants.

---

[6] Notably, Plaintiff Ditech does not outright argue this provision is ambiguous.

## II.  This Holding Is Supported By Other Pre-Policy Communications And Ditech's Actions During the Pre-Policy Period.

The above analysis could end the inquiry. The Policies provide coverage for Claims *first* made against the Insureds during the Policy Period. Dkt. 1-1 at 5; Dkt. 53-1 at 2. The Court therefore need not address whether the three pre-policy communications sent *after* the October 8th email rise to the level of a Claim.

But these other pre-policy communications provide important context that support the Court's holding above. So do the actions Ditech took before the Policy Period began. When considered collectively, the events set out below paint a clear picture showing Ditech knew before the Policy Period that the EOUST intended to hold it responsible for the escrow analysis issues.

In July 2015—over a year before the Policy Period—Ditech's predecessor sent two notices to its D&O liability carrier about its discussions with the U.S. Trustee. Dkt. 73-3; Dkt. 73-11. One of its notices explicitly mentioned the escrow analysis issues. Dkt. 73-11. It stated in part:

> [T]he U.S. Trustee's office has raised a number of issues regarding the treatment of accounts in bankruptcy. . . **More recently, GTS has engaged in discussions with US Trustee representatives regarding loan modifications and escrow analysis issues.**

*Id.* at 1 (emphasis added). Notably, Ditech alerted the D&O carrier about these discussions as early as June 2015, but it did not formally notify ASIC or Starr until April 2017. Dkt. 73-30.

22

Starting in October 2015, Ditech began calculating write-offs to remediate the escrow analysis issues. Dkt. 73-38 at 17; Dkt. 73-39; Dkt. 73-40. Ditech began these calculations shortly after receiving the October 8th email. This temporal proximity supports the Courts holding that the October 8th email was a Claim.

When calculating these write-offs, Ditech employed the "Chase Method," or the calculus for consumer remediation used by Chase in its own settlement with the U.S. Trustee. Dkt. 73-36; Dkt. 73-42; Dkt. 73-38 at 18. Ditech's use of the Chase Method shows it knew the U.S. Trustee did not tolerate this type of conduct in the mortgage servicing industry. By using a formula devised by an industry colleague accused of similar Wrongful Acts, Ditech knew these types of deficiencies could lead to remediation or settlement.

On March 30, 2016—six months before the Policy Period—the U.S. Trustee sent Ditech an email asking: "How does Ditech plan to deal with the escrow surplus or shortage caused by its failure to run escrow analyses?" Dkt. 73-15. Defendants ASIC and Starr argue this is the second pre-policy communication that independently rises to the level of a Claim. Dkt. 91 at 1. Although the Court need not decide that issue, this email clearly deals with the Wrongful Act at hand—the failure to run escrow analyses—and it intimates that the EOUST intended to hold Ditech responsible for these issues.

During a meeting on April 6, 2016—five months before the Policy Period—the Director of the U.S. Trustee Program stated that any settlement must contain four essential components, one of which was consumer remediation correcting the escrow analysis deficiencies. Dkt. 73-13 at 28–29; Dkt. 73-8 at 242–43; Dkt. 73-17 at 72. It was understood that Ditech would be responsible for the consumer remediation. Dkt. 73-13 at 29. Despite learning that the USTP was seeking a settlement that included consumer remediation for the escrow analysis deficiencies, Ditech still did not notify Defendants ASIC or Starr about these discussions.

On April 11, 2016, an attorney for the U.S. Trustee sent Ditech's counsel an email requesting a response to the settlement structure proposed during the April 6th meeting. Dkt. 73-21. This is the third pre-policy communication that Defendants ASIC and Starr argue constitutes a Claim under the Policies. Dkt. 91 at 2. Although the Court need not decide that issue, the combination of this email and the meeting a week earlier again shows Ditech knew the EOUST intended to hold it responsible for the escrow analysis issues.

On April 22, 2016, Ditech's counsel sent a letter to the EOUST saying: "Ditech agrees in principal [sic] to the four components of a potential settlement and we have begun working on a draft document to exchange with you." Dkt. 73-

24

22 at 2.  Despite agreeing in principle to a settlement, Ditech still did not notify ASIC or Starr about the EOUST's Claim.

On June 10, 2016, Ditech's counsel sent the EOUST a twenty-two page "initial draft of a proposed consent order to address the company's bankruptcy practices." Dkt. 73-23. Explicitly included in this proposal was Ditech's failure to run annual escrow analyses. *Id.* at 14–15. Although Ditech framed its proposal in a way that would have resulted in no financial loss to it for the escrow analysis issues, the mere fact that it drafted this provision of the proposal shows that Ditech knew the EOUST intended to hold it responsible for the escrow analysis issues. Indeed, Ditech sent a revised version of this same proposal to the EOUST *after* notifying Defendants ASIC and Starr of the EOUST's Claim.

On August 5, 2016—a month before the Policy Period—attorneys for Ditech and the U.S. Trustee exchanged emails regarding the U.S. Trustee's prior direction for Ditech to "re-review" the Chase settlement, including the provision meant to "credit the borrower's escrow account with the amount of Shortage that accrued after the first twelve months from the last escrow analysis." Dkt. 73-24. This is the fourth pre-policy communication that Defendants argue constitutes a Claim under the Policies. Dkt. 91 at 2. Although the Court need not decide that issue, this communication again signaled to Ditech that the EOUST intended to hold it

responsible for its failure to run escrow analyses, likely through a settlement

structure similar to the one used by Chase.

Finally, on August 10, 2016—a month before the Policy Period—Ditech

told representatives from Bank of America:

> Ditech has identified a population of [Bank of America] loans where an **escrow analysis** was not performed at least one time every 12 months during the bankruptcy. [Ditech is] in **active discussions** with the United States Trustee Program regarding the proper handling of remediation of these loans in active and discharged Ch. 13 cases and note that **all costs associated with the remediation will be borne by Ditech**.

Dkt. 73-5 (emphasis added). Here, Ditech admitted it would be required to bear the

costs for the escrow analysis remediation, yet it still did not notify ASIC or Starr

about its "active discussions" with the EOUST.

Considering the above events, it strains credence to argue Ditech had no

knowledge before the Policy Period that the EOUST intended to hold it responsible

for the escrow analysis issues. The gears of the EOUST's Claim started turning

well before the Policy Period began in September 2016. Under a claims made

policy, "[w]hen an insured becomes aware of any event that could result in

liability, then it must give notice to the insurer, and that notice must be given

'within a reasonable time' or 'as soon as practicable[.]'" *Gulf Ins. Co. v. Dolan,*

*Fertig and Curtis*, 433 So. 2d 512, 515 (Fla. 1983). Ditech plainly did not do this.

26

## CONCLUSION

The Court **GRANTS** Defendants' Joint Motion for Summary Judgment, Dkt. 72, and **DENIES** Plaintiff's Motion for Summary Judgment, Dkt. 63. The clerk is directed to enter judgment in favor of Defendants and close the case.

**DONE AND ORDERED** at Tampa, Florida, on September 20, 2021.


*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO:**
Counsel of Record